# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ORVILLE ROCAFORT, et al.　　　*
　　　　　　　　　　　　　　　　*
Plaintiffs　　　　　　　　　　*
　　　　　　　　　　　　　　　　*　　**Civil No. 98-1968(SEC)**
v.　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
IBM CORPORATION　　　　　　　*
　　　　　　　　　　　　　　　　*
Defendant　　　　　　　　　　*
*********************************

## OPINION AND ORDER

Before the Court is IBM Corporation's ("Defendant") motion for summary judgment **(Docket #42 motion & Docket #65 reply).** Orville Racafort, Frances Caro, their conjugal partnership, and Jonathan Rocafort Caro ("Plaintiffs") have filed an opposition to Defendant's motion **(Docket #60.** For the reasons set forth below, Defendant's motion will be **GRANTED.**

### Background

This is an action brought by Plaintiffs for alleged employment discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* Plaintiffs also claim a violation of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, *et seq.*; and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, *et seq.* In addition to these federal law causes of action, Plaintiffs also invoke the Court's supplemental jurisdiction, 28 U.S.C. § 1367, by alleging violations of Section 1 and 8 of Article II of the Constitution of the Commonwealth of Puerto Rico, Law 100 of June 30, 1959 (29 P.R. Laws Ann. § 146, *et*

seq.)("Law 100"); Law 44 of July 2, 1985 (1 P.R. Laws Ann. § 501, *et seq.*)("Law 44"); and

under Articles 1802 and 1803 of the Puerto Rico Civil Code (31 P.R. Laws Ann. §§ 5141 and

5142)("Articles 1802 & 1803").

The following is a factual summary of this case. On August 16, 1973 Defendant

I.B.M. hired Plaintiff Orville Rocafort as a marketing trainee in the Puerto Rico branch

office. In the course of his employment, Plaintiff was promoted to the position of Advisory

Marketing Representative.    Plaintiff maintained the level of Advisory Marketing

Representative, under differing job titles until his active employment with IBM ended on

August 14, 1997, when he was placed on IBM's Long Term Disability Plan.

While working as an Advisory Marketing Representative, in September of 1994,

Rocafort was assigned to the "horizontal territory" in the food and beverage distribution area,

where his supervisor was Cesar Maldonado. Plaintiff's principal functions were sales,

consulting, and administrative work dealing with the sale, execution and installation of the

products to his clients in the food and beverage distribution industry. On September 19,

1994, Mr. Carl Symon, General Manager for IBM's Northeast Area, of which Puerto Rico

was a part, announced plans for the reorganization of IBM's field marketing organization.

The immediate impact of the announcements was the elimination of approximately 3,000

positions throughout the United States.

Shortly thereafter, on September 28, 1994, Rocafort felt sick at work and went home.

That same day, Rocafort sought the assistance of Mr. Cesar Rodriguez, an IBM manager, and

Mr. Jose Diaz Saldana, an ex-IBM employee. Mr. Rodriguez and Mr. Diaz Saldana assisted

Rocafort by seeking medical intervention for Rocafort through an IBM hotline.

The next day, the hotline people called back and informed Rocafort that they had set

an appointment for him with Dr. Michael Woodbury Farina, a psychiatrist. The appointment

was scheduled for the next day, September 30, 1994. Dr. Woodbury determined that

Rocafort was suffering from job-related stress, and Rocafort was placed on sick leave from

September 28, 1994 until January 28, 1995.

Upon his return to work, Rocafort was assigned to the marketing group entitled

Integrated Marketing Infrastructure ("IMI"), which was managed by Mr. Angel Garcia. The

only significant difference between Plaintiff's new and old position was that the new position

contained a portion of marketing and support via the telephone or "inbound marketing" as

opposed to in person sales calls or "outbound marketing." After beginning his term with the

IMI group, from July 12, 1995 until July 31, 1995, Plaintiff again went on sick leave due to

job-related stress.

In January of 1996, Plaintiff received a formal appraisal evaluation, which was

prepared by Mr. Angel Garcia. In the evaluation, Mr. Garcia rated Rocafort in the "More is

Expected" category. Rocafort refused to discuss the assessment of his performance with Mr.

Garcia, and again he was absent from work for an extended period of time because of a

stress-related anxiety attack. Rocafort appealed his performance evaluation to Ms. Patricia

Wolpert, IBM's Area Manager, and Mr. Bob Gault, IBM's Regional Manager, both of whom

later sustained the same.

In addition to rendering her decision of Rocafort's performance assessment, Ms. Wolpert also requested that Rocafort meet with Mr. Juan De Choudens, IBM's General Manager for the Puerto Rico Branch Office.   Rocafort met with Mr. De Choudens, who informed him that he would be transferred to another position in the Puerto Rico office. Rocafort was given the choice of going to the personal computer area or the "Services Proposal Development Group."  Plaintiff selected the position in the latter group, where he was supervised by Mr. David Williams.  Mr. Williams met with Rocafort to discuss his new position, and Williams also asked an experienced Marketing Specialist, Gabriel Fernandez, to act as a mentor to Rocafort during his ninety-day training period.  Before Rocafort could become acclimated to his new position, he went on another leave of absence from July 10, 1996 until August 12, 1996.  Upon his return to work, Rocafort met with Mr. De Choudens, and they agreed that Rocafort's training period would be extended until the end of September, 1996, and he would receive full salary until the end of the training period.

On September 6, 1996, a letter was found on a printer in the IBM facility.  The letter was printed under Rocafort's identification code or "banner," and was addressed to Mr. Luis Francisco Ojeda, a local television reporter.  The letter contained sensitive and confidential IBM information.  On September 16, 1996, Mr. Williams and Mr. De Choudens confronted Plaintiff with the letter, and asked him whether or not he had printed it.  Rocafort admitted that the banner was his, but denied that he had written or printed the letter.  At that time, Mr.

De Choudens and Mr. Williams requested Rocafort's laptop computer for inspection. In the presence of Ms. Sylvia Martinez, another manager in the Puerto Rico office, they turned on Plaintiff's computer. In the "D" drive, they found a document entitled "2 Pedro," and when the document was opened, it was the same document found in the printer, except for the addressee. Mr. Williams then informed Rocafort that the document had been found on his computer's hard drive.

Faced with this information, Rocafort admitted only that his computer had been in his exclusive possession on September 6, 1996. At that point, Rocafort was offered a separation package. However, before any action was taken, Rocafort had another extended absence under IBM's sickness and accident plan. This absence lasted from September 16, 1996 until January 17, 1997. During this absence, Rocafort requested several extensions of time to consider the contents of the separation package, which he ultimately rejected.

Rocafort returned to work on January 17, 1997, at which time he met with Mr. Williams to discuss his performance objectives. As a result of this discussion, Rocafort's training period was extended until April 1, 1997. Rocafort remained on 100% salary and his work schedule was adjusted so that he would not have to travel during the heavy commuter traffic times. Shortly after returning to work, in February of 1997, Rocafort went on another extended period of leave, and never returned to work.

On May 29, 1997, Rocafort applied for benefits under IBM's Long Term Disability

Civil No. 98-1968(SEC)                                                                                            6

Plan. On August 14, 1997, it was determined that Rocafort was totally disabled[1] and his

application was approved for long term benefits. Rocafort then requested Social Security

benefits, and the Social Security Administration determined that he was retroactively entitled

to such benefits from September 16, 1996.

On December 29, 1997, Rocafort filed a charge of employment discrimination before

the Anti-Discrimination Unit of the Puerto Rico Department of Labor ("ADU") and the

Equal Employment Opportunity Commission ("EEOC"). After receiving his right to sue

letter from the administrative agencies, Plaintiffs initiated this suit. Currently, Defendant has

moved for summary judgment on Plaintiff's ADA reasonable accommodation claim.

In the motion for summary judgment, Defendant makes the following arguments: (1)

Plaintiff has failed to establish a *prima facie* case of discrimination under the ADA because

(a) he is not disabled within the meaning of the ADA; (b) he was not able to perform the

essential function of his job, with or without a reasonable accommodation; and (c) he has not

---

[1] Totally Disabled is defined by the IBM Long Term Disability Plan as:

... during the first 12 months after [the employee] completes the waiting
period, [he/she] cannot perform the important duties of [his/her] regular
occupation with IBM because of sickness or injury. After expiration of that
12 month period, totally disabled means that, because of sickness or injury,
[the employee] cannot perform the important duties of [his/her] occupation
or of any other gainful occupation for which [he/she is] reasonably fit by
[his/her] education, training or experience.

Docket #42, Defendant's exhibit 15 at section 2.4.1.

suffered an adverse employment decision;  (2) Plaintiffs have no valid claim under Title VII

of the Civil Rights Act of 1964, nor under Title I of the Civil Rights Act of 1991;[2] and (3)

Plaintiffs have failed to establish  valid claims under Law 100, Law 44 or Articles 1802 and

1803 of the Commonwealth of Puerto Rico.  In their opposition to Defendant's motion for

summary judgment, Plaintiffs argue that: (1) they have alleged a valid ADA claim because:

(a) Rocafort was disabled within the meaning of the ADA; (b) he was able to perform the

essential duties of his job, with or without a reasonable accommodation; and (c) he suffered

an adverse employment action; (2) they have established a valid claim under  Law 44 of the

Commonwealth of Puerto; and (3) they have a valid claim under Article 1802 and  1803 of

the Commonwealth of Puerto Rico.

### Summary Judgment Standard

Fed. R. Civ. P. 56(b) provides that: "A party against whom a claim . . . is asserted .

. . may, at any time, move with or without supporting affidavits for a summary judgment in

the party's favor as to all or any part [of the claims asserted against him/her]."  The Court

may grant the movant's motion for summary judgment when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[2] In their opposition to Defendant's motion for summary judgment, Plaintiffs fail
to make any response to Defendant's request for the summary dismissal of the allegations
under Title VII.  It is not clear that any such allegation is raised in the complaint, but the
Court surmises that Plaintiffs' failure to respond is most likely no oversight, but instead a
critical realization that no Title VII violation lies in the facts as pled.  As such, we will not
analyze this issue in our discussion, and Plaintiffs' cause of action under Title VII, to the
extent that one is pled, is **DISMISSED WITH PREJUDICE.**

that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c); see also  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986); NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28 (1st Cir.

1994). "The principal judicial inquiry required by Rule 56 is whether a genuine issue of

material fact exists." Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2725

at 401.

In this regard, the First Circuit Court of Appeals has noted that for a dispute to be

"genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the

issue in favor of the non-moving party. United States v. One Parcel of Real Property, 960

F.2d 200, 204 (1st Cir. 1992); see also Boston Athletic Assn. v. Sullivan, 867 F.2d 22, 24 (1st

Cir. 1989); Medina Muñoz v. R.J. Reynolds Tobacco, 896 F.2d 5, 8 (1st Cir. 1990) ("A

'genuine' issue is one that must be decided at trial because the evidence, viewed in the light

most favorable to the nonmovant, would permit a rational factfinder to resolve the issue in

favor of either party.") (citations omitted).

By like token, "material" means that the fact is one that might affect the outcome of

the suit under the governing law.  Morris v. Gov't Development Bank of Puerto Rico, 27

F.3d 746, 748 (1st Cir. 1994).  "A fact is material if it tends to resolve any of the issues that

have been properly raised by the parties." Wright, Miller & Kane, supra, § 2725 at 419. "Not

every genuine factual conflict necessitates a trial.  It is only when a disputed fact has the

potential to change the outcome of the suit under the governing law if found favorably to the

nonmovant that the materiality hurdle is cleared." Martínez v. Colón, 54 F.3d 980, 983-984 (1st Cir. 1995).

In addition, when determining whether to grant summary judgment, the Court may not weigh the evidence. Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668 (1st Cir. 1994). Summary judgment "admits of no room for credibility determinations, [and] no room for the measured weighing of conflicting evidence such as the trial process entails." Id. (citing Greensburg v. Puerto Rico Maritime Shipping Authority, 835 F.2d 932, 936 (1st Cir. 1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. Casas Office Machines, 42 F.3d at 684.

While the moving party has the burden of initially establishing that there is "an absence of evidence to support the nonmoving party's case," Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1984); the nonmovant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions." Lawton v. State Mutual Life Assurance Company of America, 101 F.3d 218, 223 (1st Cir. 1996). Furthermore, "the nonmovant must produce specific facts, in suitable evidentiary form sufficient to limn a trialworthy issue . . . Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina Muñoz, 896 F.2d at 8, (quoting

Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 181 (1st Cir. 1989) ("The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.")

### Applicable Law/Analysis

### A. Plaintiffs' Prima Facie Case

The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, prohibits discrimination against qualified individuals with disabilities. Section 102(a) of the ADA states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] discharge of employees . . . ." 42 U.S.C. § 12112(a). The statute defines discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To set forth a *prima facie* case of discrimination under the ADA, the plaintiff must show: (1) that he suffers from a "disability" within the meaning of the Act; (2) that he was able to perform the essential functions of the job, either with or without reasonable accommodation; and (3) that the employer discharged him in whole or in part because of the disability. See Lebron-Torres v. Whitehall Laboratories, 251 F.3d 236, 239 (1st Cir. 2001); Criado v. IBM Corp., 145 F.3d 437, 441 (1st

Cir. 1998).

### 1.    Whether Plaintiff was Disabled

In the case at bar, for the purposes of summary judgment, the Court will accept that Plaintiff has put forward sufficient admissible evidence to establish that he had a disability as defined by the ADA. See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 257 (1st Cir. 2001); Criado, 145 F.3d at 442-43. The evidence consists of Dr. Woodbury's medical diagnoses, which included a generalized anxiety disorder, agoraphobia and related symptoms such as palpitations, tachycardia, shortness of breath, choking, dizziness and faintness; derealization, fear of losing control and going crazy, paresthesia, chills and hot flashes. Moreover, in Dr. Woodbury's opinion, these impairments and the fears and anxieties that accompanied the same substantially limited several of Plaintiff's major life activities, such as his capacity to leave his home and engage in any social, recreational, or work activity.

### 2.    Reasonable Accommodation

Having concluded Plaintiff suffers from a "disability" within the meaning of the Act, the Court will now turn to the most disputed issue between the parties, that of the reasonable accommodation. As it pertains to this case, the ADA defines a reasonable accommodation as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

42 U.S.C. § 12111(9)(B). In determining whether a plaintiff's request for an accommodation is reasonable, the Court must make an individualized assessment based on the facts of each case. See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647 (1st Cir. 2000); Criado, 145 F.3d 443.

In the Reed case, the First Circuit Court of Appeals "clearly distinguished between the plaintiff's and defendant's burdens in ADA reasonable accommodation cases" for the first time. 244 F.3d at 257. The court began by noting that "[u]nder the ADA, the plaintiff bears the burden of proving that the defendant could provide a reasonable accommodation for [his] disability. At the same time, the statute places the burden on the defendant to show that the proposed accommodation would impose an undue burden." Id. at 258 (citation omitted). In resolving the apparent tension between these two burdens, the court followed the lead of the majority of the circuits by holding that "[i]n order to prove 'reasonable accommodation,' a plaintiff needs to show not only that the proposed accommodation would enable [him] to perform the essential functions of [his] job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." Id. The court continued by explaining that "[i]f plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details." Id.

With this framework established, the Court will now consider the facts of this case

Civil No. 98-1968(SEC)                                                                13

to determine whether Plaintiff's requests for accommodations were reasonable.[3]  The first

issue the Court must consider is whether the intermittent leaves of absence that Plaintiff took

from work were reasonable accommodations.  In their opposition to Defendant's motion for

summary judgment, Plaintiff describes this issue as follows:

> [p]laintiff began to receive psychiatric treatment for these impairments on
> September 30, 1994, after he sustained his first nervous breakdown.  The
> medical treatment has consisted ever since of continuous psychiatric sessions
> and medications with Dr. Woodbury.  Moreover, since 1994, the treatment
> also consisted of accommodating plaintiff to receive intermittent leaves of
> absence from work.  These medical treatments and leaves of absence from
> work constituted a kind of reasonable accommodation that did allow plaintiff
> to recuperate and be able to return to work and to continue to satisfactorily
> perform the essential duties of his post.

**(Docket #60 at 7).**  Defendant does not argue that Plaintiff's intermittent leaves of absence

were unreasonable requests in light of Plaintiff's condition.  In fact, Defendant concedes that

in some circumstances a leave of absence is a reasonable accommodation.  See Criado, 145

F.3d at 443 (holding that a leave of absence and leave extensions are reasonable

accommodations in some circumstances); Garcia-Ayala, 212 F.3d at 647 (holding that "[i]t

is simply not the case, under our precedent that an employee's request for an extended

medical leave will necessarily mean, as the district court suggested, that the employee is

unable to perform the essential functions of her job[,]" or a *per se* unreasonable

---

[3] The parties also dispute whether or not Plaintiff ever sufficiently communicated
requests for accommodations to Defendant.  However, because we will hold that
Plaintiff's proposed accommodations are unreasonable, the Court need not reach this
issue.

accommodation). Instead, Defendant argues that Plaintiff was never denied any such request

for a leave of absence. A review of the record upholds this averment. For example, Rocafort

was on sick leave due to job related panic attacks from September 28, 1994 until January 28,

1995; from July 12, 1995 until July 31, 1995; for around six weeks from approximately

January of 1996 until February or March of 1996; from July 10, 1996 until August 12, 1996;

from September 16, 1996 until January 17, 1997; and from the beginning of February of

1997 until he was approved long-term disability on August 14, 1997.   The record in this

case, unlike the Garcia-Ayala and Criado cases, demonstrates that IBM not only allowed

Plaintiff to take as many leaves as he needed, but also extended his periods of leave when the

circumstances concerning Plaintiff's disability would not allow him to return to work. As

such, the Court finds that to the extent Plaintiff requested an accommodation in the form of

intermittent leaves of absence, those requests were allowed by IBM.

The next accommodation that Plaintiff sought was a schedule adjustment so that he

could begin and end his day later, so that he would not have to travel during the heavy

commuter traffic. The Court finds that this request for a "modified work schedule" also

qualifies as a request for a reasonable accommodation under the ADA, and we also find that

Defendant granted Plaintiff's request.

We now reach the most contested area of this matter, exactly what job-related

accommodations were requested by Plaintiff, and whether or not the requests were

reasonable. Before delving into this issue, the Court will first revisit the First Circuit's

opinion in <u>Reed</u>. In that case, the court made it clear that the employee's request must be "sufficiently direct and specific," giving notice that [they] need a "special accommodation." <u>Reed</u>, 244 F.3d at 261 (quoting <u>Wynne v. Tufts Univ.</u>, 976 F.2d 791, 795 (1st Cir. 1992) (quoting <u>Nathanson v. Medical Coll. of Pa.</u>, 926 F.2d 1368, 1381 (3d Cir. 1991)). Furthermore, "the request must explain how the accommodation requested is linked to some disability. The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." <u>Id.</u> (citations omitted).

We begin our analysis of this issue by noting that Plaintiff is incorrect in his legal conclusion on the allocation of the burdens in this case. In his opposition to Defendant's motion for summary judgment, Plaintiff argues that IBM bears the responsibility for determining the kind of accommodation that was necessary in the working environment, more so in a case such as this one where Plaintiff's mental impairment made it difficult for him to communicate. **(Docket #60 at 8).** In addition Plaintiff claims that "[i]t was for IBM medical to decide, after consultation with Dr. Woodbury, the kind of adjustments that had to be done in Plaintiff Rocafort's work environment at his return to work so as not to allow his mental impairments to interfere with his job performance." **(Id.)** Plaintiff concludes by averring that "[i]t was also for IBM Medical to instruct Management to accommodate Plaintiff by avoiding to create unnecessary stressors to him at work." **(Id.)** These arguments, which attempt to place all of the burden for providing a reasonable accommodation upon

Defendant, assume that Plaintiff has initiated the interactive process by providing a sufficiently direct and specific notice to Defendant that a reasonable accommodation was necessary. The Court will now analyze the evidence to determine exactly what requests were made.

According to the deposition testimony of Dr. Woodbury, Plaintiff's treating psychiatrist, the following provides a summary of the requests for reasonable accommodations between Plaintiff (through Dr. Woodbury) and IBM's medical staff:

1.  Around the time of Plaintiff's first leave of absence Dr. Woodbury diagnosed him with an anxiety disorder. Upon his return to work, Plaintiff was placed in another department. It was Dr. Woodbury's opinion that Plaintiff should have been placed in his prior position so that he did not have to face new stressors and trauma. During his deposition, Dr. Woodbury was asked whether he communicated this to IBM, and he responded that "Uhhh, let's say I didn't feel I had to. And, again, uhhh, I was dealing with the, uhhh, with IBM medical, and I always sensed that it was IBM medical then that was communicating with management and telling management what to do." **(Docket #52, ex. 6 at 22).**

2.  Later in the deposition, Dr. Woodbury is asked whether he, at any time, requested any type of accommodation for Orville Rocafort. Dr. Woodbury answered that he had conversations on July 29, 1996, and August 1, 1996 with Dr. Gonzalez of IBM Medical concerning Plaintiff's condition. Dr. Woodbury suggested or requested that Plaintiff return to work without excessive scrutiny from management, and that he be provided with a stress-free environment. That request can be found in the following testimony, ". . . but with a reasonable expectation that his job was not under excessive scrutiny, uhhh, he could perform. And once his job was under excessive scrutiny, uhhh, that would be an unreasonable accommodation that would have then provoked the emotional disorder to a level where he could not perform at work." **(Docket #52, ex. 6 at 51-52).**

3.    Finally, on September 19, 1996, Dr. Woodbury called Dr. Gonzalez of IBM Medical about the letter that Plaintiff had allegedly written, and the fact that Plaintiff thought he would be fired when he returned to work. Plaintiff's concerns were seemingly alleviated however, as evidenced by an e-mail exchange between Rocafort and General Manager Juan de Choudens, which reads as follows:

[text of de Choudens' message]:

"Orville, I am glad that you feel good about our meeting. My objective was to clarify any misunderstanding you could have on your status at IBM. As soon as David comes back he is going to get together with you to over your training plan since he feels that the way he conveyed the message left you with a wrong impression. Nevertheless, I don't think we should spend more time on this issue and let's all put our energy on your training, since we discussed, IBM PR needs to maximize our opportunities in this market place."

[text of Rocafort's reply]

"I want to thank you for the courteous and honest discussion we had this morning regarding my profs note dated July 10, 1996. I just want to confirm your offering [sic] extending my training to Sept. 30, 1996, and to take me out of quota until that date, to off-load the pressure inherent to it while in training. Based on the concern you demonstrated regarding the situation and the interest you have shown in understanding the unpleasant predicament I went through that morning of July 10, 1996, I would like to reiterate that the events narrated in that profs note are true and absolute, and I am willing to confront Mr. Williams, if you wish to do so, with its content."

**(Docket #42, ex. 6).**

According to Dr. Woodbury, his opinion concerning the return of Plaintiff to his previous position was not communicated to IBM because he felt that it was not necessary. As such, the Court agrees with Defendant that no ADA violation lies for Defendant's failure to accommodate because the record does not reflect a specific and direct accommodation was made either by, or on behalf of Plaintiff. In addition, the Court finds that Plaintiff's concern

about being fired upon his return to work was adequately dealt with by IBM, inasmuch as Plaintiff's e-mail demonstrates his level of satisfaction with the handling of the situation. Moreover, Rocafort was not fired by IBM; in fact, he was given an extension of his training period until September 30, 1996 and was not required to fulfill quotas until his training period concluded. This concern about his continued employment, like Plaintiff's requests for leaves of absence, could not be violations of the ADA, especially when Defendant indulged each of Plaintiff's requests.

The final request for an accommodation is Plaintiff's request to return to a work environment without close scrutiny from management and an absence of undue and aggravating stressors. This request is nearly identical to the plaintiff's request for accommodation in the case of Gaul v. Lucent Technologies, Inc., 134 F.3d 576 (3rd Cir. 1998). In Gaul, plaintiff requested that defendant transfer him away from individuals causing him prolonged and inordinate stress. Id. at 579. The court found that plaintiff's request for accommodation was unreasonable as a matter of law, and upheld the district court's granting of summary judgment. First, the court stated, "Gaul's proposed accommodation would impose a wholly impractical obligation on AT&T or any employer. Indeed, AT &T could never achieve more than temporary compliance because compliance would depend entirely on Gaul's stress level at any given moment." Id. at 581. In addition, the court found that the term "prolonged and inordinate stress" was "not only subject to constant change, it is also subject to constant abuse." Id. Finally, the court reasoned that

"[t]he only certainty for AT&T would be its obligation to transfer Gaul to another department whenever he becomes 'stressed out' by a coworker or supervisor. It is difficult to imagine a more amorphous 'standard' to impose on an employer." Id.

For identical reasons we find that Plaintiff's request for a stress-free work environment is unreasonable as a matter of law. First, IBM, like AT&T, could hope for no more than fleeting compliance with the request because conformity would necessary depend on how Plaintiff felt on any given day. Moreover, attempting to provide Plaintiff with a stress-free environment, separated from stressors, would also provide Rocafort with an opportunity for abuse. Finally, it would not only be an unreasonable precedent to set, but it is also difficult to imagine how IBM or any employer could provide a workplace free from "excessive scrutiny" or stress, especially when these terms are subject to divergent interpretations depending on the atmosphere and conditions of employment. As such, Plaintiff's cause of action under the ADA will be dismissed as a matter of law.

**Plaintiff's Supplemental Law Claims**

As to the pending pendent jurisdiction claims in the present case, it is hornbook law that a district court has discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a common nucleus of operative facts. See 28 U.S.C. §1367; United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Nevertheless, where, as here, all federal claims warrant dismissal prior to trial, the district court should decline to exercise supplemental jurisdiction.

It has been stated that the holding in Gibbs "seems to clearly require dismissal without action on the merits and without any exercise of discretion if all the federal claims ... are found to be short of trial, deficient." Snowden v. Millinocket Regional Hosp., 727 F.Supp. 701, 709 (D.Me. 1990). Such a result is warranted in view that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the law suit." Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991).

Although District Courts are not obliged to dismiss pendent state law claims, in the usual case in which all federal law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine–judicial economy, convenience, fairness and comity–will point toward declining to exercise jurisdiction over the remaining state law claims. In such a case, state-law claims should be dismissed. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.5 (1988); citing Gibbs, 383 U.S. at 726-27; see also Mercado-Garcia v. Ponce Federal Bank, 979 F.2d 890, 896 (1st Cir. 1992); Rivera v. Murphy, 979 F.2d 259, 264 (1st Cir. 1992); Figueroa Ruiz v. Alegria, 896 F.2d 646 (1st Cir. 1990); cf. Vega v. Kodak Caribbean, 3 F.3d 476, 478 (1st Cir. 1993) (holding that "when the district court disposed of the ADEA claims, the pendent claims became subject to dismissal for want of subject matter jurisdiction"); Feinstein v. Resolution Trust Corp., 942 F.2d 34, 47 (1st Cir. 1991) (stating that "since federal question jurisdiction hinged on that [dismissed] count, and there was no complete diversity of citizenship or other cognizable basis for the

assertion of subject matter jurisdiction in the district court, the pendent state law claims were properly dismissed under the rule of United Mine Workers v. Gibbs").

Supplemental jurisdiction should be declined in this case in view that the state law claims substantially predominate over the federal claims. The Supreme Court has held that judicial economy, convenience, fairness and comity favors "a decision to relinquish jurisdiction when state issues predominate, whether in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought." Carnegie-Mellon, 484 U.S. at 350 n.5, citing Gibbs, 383 U.S. at 726. Since Plaintiff is not entitled to any award under the ADA or the Title VII, the only award Plaintiff could, in any event, pursue would be under the commonwealth statutes. Therefore, Plaintiff's claims under by alleging violations of Section 1 and 8 of Article II of the Constitution of the Commonwealth of Puerto Rico, Law 100 of June 30, 1959 (29 P.R. Laws Ann. § 146, *et seq.*)("Law 100"); Law 44 of July 2, 1985 (1 P.R. Laws Ann. § 501, *et seq.*)("Law 44"); and under Articles 1802 and 1803 of the Puerto Rico Civil Code (31 P.R. Laws Ann. §§ 5141 and 5142)("Article 1802 & 1803") will be dismissed without prejudice.

**Conclusion**

For the reasons set forth above, Defendant's motion for summary judgment is **GRANTED.** Plaintiffs' federal claims under Title VII and the ADA are **DISMISSED WITH PREJUDICE**, and the Commonwealth claims are **DISMISSED WITHOUT PREJUDICE.**

**Civil No. 98-1968(SEC)**                                                    22

**SO ORDERED.**

In San Juan, Puerto Rico, this _3/ st_ day of March, 2002.

SALVADOR E. CASELLAS
United States District Judge